In the Matter of the Revocation of a Trust between WALTER SCHLUSSEL, as Settlor, and CENTRAL HANOVER BANK AND TRUST COMPANY, as Trustee.

Supreme Court, Special Term, New York County, May 9, 1949.

*Henry Hofheimer* and *Henry Hofheimer, Jr.*, for settlor, petitioner.

*Nathaniel L. Goldstein, Attorney-General* (*P. Hodges Combier* of counsel), for indefinite and uncertain beneficiaries.

*J. Culbert Palmer* for trustee.

HOFSTADTER, J. This proceeding under article 79 of the Civil Practice Act presents a somewhat unusual aspect of the problem of the revocation of an *inter vivos* trust, because of the possible interest in the trust of an unnamed charitable institution.

The trust indenture dated March 28, 1921, was entered into between the petitioner as settlor and Central Union Trust Company (now Central Hanover Bank and Trust Company) as trustee. Though the petitioner was then a resident of Chicago, Illinois, and executed the indenture in that city, the agreement directs that it " shall in any and all respects and events be construed according to the laws of the State of New York ".

Under the terms of the indenture one half of the net income of the trust is payable to the settlor for life and the other half is payable to his wife Violet for life, and on the death of either the entire income is payable to the survivor for life.

On the death of both the settlor and his wife leaving no children " begotten by them " then, by the indenture, all the said estate, including the income thereof still in the possession or control of the said trustee, shall be paid and turned over by the said trustee to Seymour Schlussel and Ethel S. Weil, or the survivor of them; and in case the said Seymour Schlussel and the said Ethel S. Weil shall not then be living, but shall have named a charitable institution in their wills or any other valid instrument to receive such estate, then said trustee shall pay and turn over to such charitable institution the said settlor's estate. Should, however, no such charitable institution or charity provision be made in and by the wills or other valid instrument of said Seymour Schlussel and Ethel S. Weil, or either of them, then the said trustee shall pay over to such charitable institution as it may select or create for such purpose, the said settlor's estate in memory of the said Alexander Schlussel, deceased, and Lottie Schlussel, then deceased.

There are alternative directions for the payment of both income and principal to any children " begotten " by the settlor and his wife. Since this couple are childless and the settlor is now seventy and his wife sixty there is no need to state the substance of these alternative provisions.

Seymour Schlussel and Ethel S. Weil are respectively the brother and sister of the settlor and both are now living.

By the indenture the settlor declared the trust irrevocable. However, by a formal instrument served on the trustee on January 11, 1949, the settlor revoked the trust and at the same time filed with the trustee consents to the revocation executed by his wife, Violet C. Schlussel, by his brother and sister, and by the Attorney-General of the State of New York. Further detailed comment on the Attorney-General's release will be made in the course of this opinion. The question posed is whether the trust has been effectively revoked by these instruments — that is, whether, as required by section 23 of the Personal Property Law, " all the persons beneficially interested " have consented.

If they have, then the trust is revoked, notwithstanding that it is stated to be irrevocable (*Berlenbach* v. *Chemical Bank & Trust Co.*, 235 App. Div. 170, affd. 260 N. Y. 539). It is now established that the consent of all persons in being beneficially interested in the trust satisfies the statute and that the possibility of unborn persons becoming interested does not prevent a revocation (*Smith* v. *Title Guar. & Trust Co.*, 287 N. Y. 500; *Glanckopf* v. *Guaranty Trust Co. of N. Y.*, 274 App. Div. 39). It is clear then that the settlor's wife, brother and sister having consented to the revocation, the consents of all natural persons beneficially interested have been obtained. The difficulty arises because of the provision of the indenture for the benefit of an unnamed and uncertain charitable institution contingent on Seymour Schlussel and Ethel S. Weil not surviving the settlor and his wife.

For it will be recalled that on the death of both the settlor and his wife, the principal passes to the brother and sister, " or the survivor of them ". Should either the brother or the sister survive the two income beneficiaries, the gift to charity does not take effect. It is only in the event that the brother and sister die before the death of both life beneficiaries that the charitable gift becomes operative. It is clear that the interest of the charitable institution to be named or created is wholly contingent and would be cut off by the survival of the settlor's brother or sister.

It now becomes appropriate to state the terms of the consent executed by the Attorney-General. The consent is given in

return for a formal agreement executed by the settlor by which he binds himself, in consideration of the Attorney-General's consent, on the revocation of the trust, to create a new trust of the net assets of the present trust, after deduction of commissions, attorneys' allowances and expenses, less the sum of $15,000 which is to be paid over to the settlor. The new trust is to provide for the payment of all income to the settlor and his wife for their joint lives and for the payment of the principal on the death of the survivor to named charitable organizations. Thus, the brother and sister whose interest under the present trust, if either survives, is prior to that of the charity, will not participate at all in the new trust and for a contingent remainder to a single charity under the indenture there is substituted a vested remainder to designated charities. The Attorney-General's consent to the revocation of the present trust is predicated on the simultaneous consummation of the foregoing agreement and is also made subject to the approval of this court.

It is not without interest that as an alternative to the prayer for a declaration that the trust has been revoked the settlor prays that the trustee purchase for the trust estate a one-family house for occupancy by the settlor and his wife at a maximum cost of $15,000. It is implicit that if the trust is declared revoked the settlor will apply the $15,000 payable to him to the purchase of a home.

The trustee resists the attempted revocation and argues very earnestly that the provisions in favor of the unnamed charity prevent revocation. The trustee's argument is twofold: it urges, first, that the alternative power given to it to designate the charitable recipient is an imperative special power in trust which cannot be extinguished and, next, that the beneficial interest of a charitable institution, though unnamed and indefinite, and though contingent, makes the trust indestructible.

Section 157 of the Real Property Law defines an imperative trust power as follows: "A trust power, unless its execution or non-execution is made expressly to depend on the will of the grantee, is imperative, and imposes a duty on the grantee, the performance of which may be compelled for the benefit of the person interested. A trust power does not cease to be imperative where the grantee has the right to select any, and exclude others, of the persons designated as the beneficiaries of the trust."

So far as here material, section 183 of the Real Property Law, which deals with the release of powers, provides: "1. Any power which is exercisable by deed, by will, by deed or will, or other-

wise, whether general or special, other than a power in trust which is imperative, is releasable either with or without consideration, by written instrument signed by the grantee and delivered as hereinafter provided.''

The sections of the Real Property Law governing powers are equally applicable to trusts of personalty (*Matter of Moehring,* 154 N. Y. 423, 427; *Cutting* v. *Cutting,* 86 N. Y. 522, 546).

An instructive analysis of the classes of powers in relation to the right of the holder of the power to surrender it is found in *Merrill* v. *Lynch* (173 Misc. 39, 48). Ordinarily, when the grantor provides for the disposition of the remainder on the failure of the donee of a power of appointment to exercise it, the power is regarded as discretionary, not imperative. The parties agree that since the indenture does dispose of the remainder in the event that neither the settlor's brother nor sister names a charitable institution to receive the trust principal, the power held by the brother and sister is not imperative and does not stand in the way of a revocation. It was, however, suggested on argument that to cut off a possible future claim under a will executed by either the brother or the sister, prudence dictates that they both now execute releases of the power granted to them by the indenture. This suggestion was readily accepted and appropriate releases are to be filed.

I shall assume that the alternative power given to the trustee is an imperative power in trust. (See *Smith* v. *Floyd,* 140 N. Y. 337; *Matter of Leo,* 170 Misc. 491.) Nevertheless, I am unable to adopt the view that section 183 of the Real Property Law is a bar to revocation. That section, which became law April 14, 1943 (L. 1943, ch. 476), and took effect immediately, was intended primarily to enable the holder of a power of appointment to take advantage of the then recently adopted amendments of the Federal Internal Revenue Code, which permitted him through release of the power in conformity with the code, to exclude from his estate in fixing the estate tax on it, the property over which he held the power of appointment. The occasion for its enactment was the amendment of the Federal code and its aim, consonantly with such amendment, to afford tax relief to the holder of the power and his estate. (See *Matter of Pope,* 184 Misc. 419.)

With this background, it is clear that section 183 of the Real Property Law has to do solely with the right of the holder of a power to surrender it. That is why it provides that a power is releasable " by written instrument signed by the grantee ". One would hardly expect such legislation to go to the length of authorizing the grantee of an imperative power in trust, which

imposed on him a duty to others than himself, the performance of which could be compelled for their benefit, to release this power without their consent. For this reason, such a power may not be released by the grantee of the power.

In this case, however, we are not concerned with an attempted release by the grantee. The trustee, the holder of the power, far from releasing it, insists that the power may not be taken from it. If this trust is held to have been revoked, this result will not flow from a release or other voluntary act on the part of the trustee but will be imposed on the trustee against its will. Rather than being surrendered by the trustee, the power will be dissolved in its hands by the action of those beneficially interested.

Section 183 of the Real Property Law, in my opinion, forbids a release of the imperative power in trust by its holder, but not the extinction of the power by effective revocation of the trust. The revocation is governed by section 23 of the Personal Property Law, under which all persons beneficially interested in the trust must consent. Since the trustee asserts no beneficial interest, its consent is unnecessary.

We are thus brought to the more basic and difficult question whether the beneficial interest of an unnamed charitable institution in the exercise of the power by the trustee renders revocation impossible. Or, differently stated, may the Attorney-General as the representative of indefinite and uncertain charitable beneficiaries under section 12 of the Personal Property Law validly consent to the revocation of this trust? The outcome of this proceeding hinges on the answer to this question on which the courts of this State do not seem to have passed.

The policy of the State is undoubtedly to encourage charitable gifts. That policy is today embodied in the Tilden Act (Real Property Law, § 113; Personal Property Law, § 12), by which the law of charitable trusts, as declared by our courts before 1853, following the law of England, was substantially restored (*Allen* v. *Stevens,* 161 N. Y. 122, 141; *Matter of Potts,* 205 App. Div. 147, affd. 236 N. Y. 658).

The designation of the Attorney-General as the representative of indefinite and uncertain charitable beneficiaries confirms the office which the Attorney-General has traditionally held in this field. Historically, it has been his function to champion the cause of charity in the courts, and, as such, to act for named as well as indefinite beneficiaries. (*Trustees of Sailors' Snug Harbor* v. *Carmody,* 158 App. Div. 738, 755, affd. 211 N. Y. 286, 300.)

The trustee argues that since the statute charges the Attorney-General with the duty to enforce charitable trusts, he is without

power to consent to the revocation of the trust. In support of this contention the trustee cites cases which announce and apply the rule that a charitable corporation may not divert a fund from its declared purpose.

I do not find it necessary to discuss these and like cases in detail because they arose under circumstances wholly different from those now before the court. They dealt with the disposition of property already in the possession of a specifically named institution or given to it by will or other instrument (e.g., *St. Joseph's Hosp.* v. *Bennett,* 281 N. Y. 115; *Authors Club* v. *Kirtland,* 248 App. Div. 82; *Matter of Lachat,* 184 Misc. 486). Such a situation is hardly comparable to this one, in which, if the present trust runs its course, a charity may never get anything and, in any case, the ultimate recipient, if a charity, is uncertain. It is also noteworthy that when the court has found an unlawful diversion it has done so at the instance of the Attorney-General himself.

I am referred to no authority which denies the power of the Attorney-General to enter into or to sanction a compromise of the rights of charitable beneficiaries, whether named or indefinite. The courts of other jurisdictions have held that such power does reside in the Attorney-General (*Andrew* v. *Master & Wardens of Merchant Taylors' Co.,* 7 Ves. Jr. 223, 32 Eng. Rep. 90; *Andrew* v. *Trinity Hall,* 9 Ves. Jr. 525, 32 Eng. Rep. 706; *Attorney-General* v. *Mayor of City of Exeter,* 2 Russ. 362, 38 Eng. Rep. 372; *Matter of King* [*Jackson* v. *Attorney-General*], [1917] 2 Ch. 420; *Burbank* v. *Burbank,* 152 Mass. 254). In *Attorney-General* v. *Mayor of City of Exeter* (*supra*) Lord Eldon had before him an information filed in 1811 to require an accounting of a charity established in 1629, it having been asserted that the City of Exeter, charged with the duty of administering the charity, had used some of the fund for its general corporate purposes or for other charities. Though, because of the lapse of time, many of the records were no longer available and there was consequent difficulty in stating an accurate account, still the master found that the defendants were chargeable with the sum of £5215, 7s. 1d. The court referred to the Attorney-General the question whether it would be proper that the charity accept a less sum in satisfaction of the balance so found due by the master, Lord Eldon, then confirmed the certificate of the Attorney-General which recommended the acceptance of £2,500 in satisfaction of the larger sum due.

In *Matter of King* (*Jackson* v. *Attorney-General*) (*supra*) the charitable beneficiaries under a sixth codicil sought to disavow

a compromise made on their behalf by the Attorney-General of a proceeding in which they, though cited, did not appear. The codicil, which made gifts both to a named charity and to four others to be selected by the trustees, was attacked on the ground of lack of mental capacity of the testator. Here, too, the court held the charities bound by the action taken for them by the Attorney-General.

Similarly, in *Burbank* v. *Burbank* (*supra*) the court held citizens of the town of Pittsfield, the beneficiary of charitable gifts under a will, to have no standing to challenge a proposed compromise between the town and the testator's heirs, to which the Attorney-General, a party to the action, had interposed no objection. He, not those beneficially interested in the charity, represented the public interest.

The foregoing authorities, in my opinion, lay down a sound doctrine which should be followed in this State.

*Matter of Lachat* (184 Misc. 486, *supra*) cited by both the Attorney-General and the trustees, clearly recognizes that the circumstances of a given case may justify the compromise by a charitable corporation of its rights; if so the compromise may properly be assented to by the Attorney-General and will receive judicial approval (p. 492). A fortiori it could be true, then, that where *indefinite* charities with interests wholly *contingent,* are concerned, the authority recognized by custom, precedent and statute to act for charities, namely the Attorney-General, may effect a result under which a *designated* charitable beneficiary will secure a *definitive* and absolute right to substantial property.

The trustee insists, however, that what is attempted here is not a compromise at all but a plain renunciation. Its position is thus stated in its brief: "The Attorney General has no authority to bargain for a better trust. This is not a case of compromise, there being no question as to the validity of the trust." I cannot accept the premise that occasion for compromise arises only when the validity of the trust is questioned. The agreement pursuant to which the Attorney-General has consented to the revocation of this trust is in its very essence a compromise. It is to be recalled that the interest of the charitable institution under the trust as it now stands is at best inchoate. The consent to revocation, though in a sense a surrender of this inchoate interest, is inseparable from the simultaneous acquisition by designated charitable institutions of a vested remainder under the new trust. It is unrealistic and inadmissible, I think, not to accept this transaction for what in truth it is — a compromise. Under the authorities it is, therefore, within the competence of

the Attorney-General to bind the uncertain charitable beneficiaries by it.

If my conclusion that the Attorney-General has effected a permissible compromise is correct, it is unnecessary to consider the broader question whether the Attorney-General may, on behalf of indefinite and uncertain charitable beneficiaries, consent unqualifiedly to the revocation of a trust in their favor. The far-reaching effect of a holding that he may not is well illustrated in this case. The power given to the trustee to select a charitable beneficiary has not yet and may never come into being or, at any rate, become operative. The survival of either the brother or sister of the settlor may cut off the rights of the possible charitable beneficiaries altogether. The trustee argues that, notwithstanding the wholly contingent interest of the unnamed charity, the provision for charity in the indenture forbids termination of the trust. I need hardly point out that a decision upholding this contention of the trustee might well deter a settlor from making a charitable gift in a trust instrument, lest he later found that solely through his benevolence he had made himself powerless to revoke the trust. It is questionable, at least, whether so rigid a limitation on the authority of the Attorney-General would further the cause of public charity. However, I believe, as already, stated, that the present application can be disposed of without passing on this vexing question.

The Attorney-General's consent to revocation has been given, subject to the approval of the court. I assume that in requesting such approval the Attorney-General seeks confirmation of his authority under the law to give the consent, rather than ratification of his judgment in giving it. I have already expressed the view that the Attorney-General possesses the power to execute the consent on the terms stated. Primarily it is for the Attorney-General, as the officer charged with the duty of protecting charitable beneficiaries, to exercise his own discretion in the circumstances. If the court has any power to overrule the Attorney-General's exercise of discretion, it is a power to be used only in an extreme case. Since obviously this is not such a case all I need determine is that the Attorney-General has not exceeded his lawful authority and that there is no suggestion of abuse of discretion.

My conclusion is that the trust has been effectively revoked. The alternative relief requested by the petitioner has thus become academic.

Settle order in conformity **herewith.**